# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00794-CR

**Lee Christopher Vaughn, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM COUNTY COURT AT LAW NO. 3 OF HAYS COUNTY
### NO. 20-1254CR-3, THE HONORABLE ELAINE BROWN, JUDGE PRESIDING

## O P I N I O N

Lee Christopher Vaughn was charged with the offense of displaying harmful material to a minor. *See* Tex. Penal Code § 43.24. The alleged victim was L.M., who was the daughter of Vaughn's long-term girlfriend.[1] Prior to the start of trial, Vaughn elected to have the trial court assess his punishment if convicted. At the end of the guilt-innocence phase, the jury found him guilty of the charged offense. Following a punishment hearing, the trial court sentenced Vaughn to 180 days in jail but suspended the sentence and placed him on community supervision for twenty-four months. *See id.* §§ 12.21, 43.24(d). In one issue on appeal, he argues that the trial court erred by allowing the State to amend the information charging him with the alleged offense. Our sister courts of appeals have addressed the issue in three different ways.

---

[1] Because L.M. was a minor when the alleged offense occurred, we will refer to her by her initials and to her family members by their relationships to her. *See* Tex. R. App. P. 9.10(a)(3).

We will address the issue under the three avenues, but they all lead us to affirm the trial court's judgment of conviction.

**BACKGROUND**

Vaughn and Mother began dating in 2016, and he later moved in with Mother, L.M., and L.M.'s younger brother. When Vaughn moved in, L.M. was ten, and her brother was eight. In 2020, L.M. made an outcry concerning Vaughn and gave a statement to a forensic interviewer concerning the outcry. Around that time, L.M. and Brother went to live with their biological father, and Mother and Vaughn were ordered not to be alone with the children. As part of the investigation, the police contacted Vaughn to see if he would like to talk about the allegations, and he agreed to go to the police station and answer some questions. That interview was recorded.

During the interview, Vaughn discussed various interactions he had had with L.M. and discussed some of the claims that she had made. First, he recalled how around three years earlier, L.M. saw him naked at their house. More specifically, he explained that he had fallen asleep during the day because he had the flu, that L.M. came home from school, that she walked past the primary bedroom, and that she saw him naked on the bed. He remembered getting under the covers when he heard her in the house. He later asked her if she saw him naked, and she said that she did but that it was not a big deal. In addition, he discussed how she asserted that he hugged her once while he was naked, but he told the officers that he was under a comforter at the time and that L.M. had asked for the hug. Regarding another incident, he stated that L.M. had asked to massage his back when he was injured. According to him, she did such

2

a good job on his back that he rolled over and asked her to try the same thing on his side below his liver.

Next, Vaughn related to the officers that L.M. claimed that he offered to help her insert a tampon when she was having issues, but he denied ever making that offer. He did admit to having conversations with her about sex and masturbation, but he stated that Mother was present during some of those conversations and that L.M. had asked him to talk to her about sex because she did not feel comfortable talking with Father and because she felt Mother would not give her enough information. During one of these conversations, Vaughn asked L.M. if she had masturbated yet, and she told him that she had not. A few days later, she told him that she had tried masturbating but did not know what was supposed to happen. He told Mother about the conversation and asked Mother to be present during the next one. L.M. asked for a magazine with naked men in it, but Mother and he could not locate one. Approximately one week later, L.M. asked for a vibrator, and Mother and he bought L.M. one.

According to Vaughn, L.M. later told him that she had not been able to have an orgasm with the vibrator. He decided to locate "pornographic" videos of women masturbating and asked Mother to view the videos and narrow them down to a few to show L.M. Mother and he chose two videos showing individual women masturbating, and he described the videos as being as close to "visually educational" as they could be. He loaded the videos on his phone, let L.M. borrow his phone to watch the videos, left her alone, and told her to tell him when she was finished. He denied being in the room when L.M. watched the videos.

After the interview, Vaughn left the police station. Following that interview, Mother drove to L.M. and Brother's school and picked them up from school even though they were living with Father at the time. One of the school employees had concerns about Mother's

3

leaving with the children and called the police to have them perform a welfare check on the children. Shortly after Mother drove L.M. and Brother to her house, the police arrived to check on the children.

The police later obtained an arrest warrant for Vaughn. After obtaining the warrant, the police located Vaughn's SUV, which was being driven by Mother. The police pulled the car over and found Vaughn hiding in the backseat under some blankets. Once the police found him, they arrested him and transported him to jail. The arrest and the events immediately leading up to it were recorded by one of the officer's body cameras.

Vaughn was charged with displaying harmful material to a minor. During the trial, the State called the following witnesses: L.M., Brother, an expert on sexual crimes involving children, one of the police officers present during Vaughn's interview, one of the officers who responded to the request for a welfare check, and one of the officers who arrested Vaughn. In his case-in-chief, Vaughn called the following witnesses: Mother, L.M., and an investigator in the case. The witnesses testified regarding the events summarized above and additional events detailed below. Recordings of Vaughn's interview and his arrest were admitted as exhibits.

In her testimony, L.M. related that Vaughn started talking to her about sex when she was eleven and did so when no one was around. She stated that she did not ask him to talk about sex or want to talk about it with him. While they were watching a movie, he told her that if anyone ever sexually abused her, he would kill that person. When relating that statement, "he put his hand on the inside of [her] thigh and drew [her] closer to him." Later that same day, he asked her if she had ever masturbated and then urged her to learn about it. Vaughn continued initiating the talks and began encouraging her to masturbate because it was a stress reliever. He

4

later bought her a vibrator and showed her how to use it with his hands. He also bought her tampons while she was in sixth grade and offered to insert one for her "so [she] knew how it worked." On another occasion, he took her to Victoria's Secret and made her model bras for him in a fitting room.

Additionally, L.M. testified regarding physical interactions she had with Vaughn. First, she said that once when they were alone, he hugged her from behind, reached over her torso, and massaged her breast. She related that he did not hug Brother that way. Regarding another hug, she recalled that Vaughn asked her to give him a hug while he was naked in bed with his penis covered up. Concerning another event, she related that she came home from school and saw him naked on his bed pretending to be asleep. She also remembered that he asked her to give him a massage while he was in his underwear, moved her hands closer to his groin, said that area hurt too, and encouraged her to massage his penis. He had an erection at that time.

L.M. said that Vaughn showed her pornographic videos three times while she lived with him. The first time occurred when she was twelve. She testified that although she did not ask Vaughn questions about sex or masturbation, he started talking with her in his bedroom about how men masturbate and told her he was going to "teach[]" her so she would know "how to jerk off a man when [she] was older or whenever [she] had the chance to." No one else was present in the room, and he closed the door before showing her a video on his phone of a man "[s]troking his hand down his penis." Vaughn sat next to L.M. while holding his phone. Vaughn played the second video in the same general time frame while they were in his bedroom after he locked the door. The video was of a man and a woman masturbating. She remembered that he said he was educating her about how men and women have foreplay. Although she did

5

not remember exactly when she saw the third video, L.M. testified that the video was of a man "stroking his hand up and down his penis until he . . . ejaculated."

When describing the videos, L.M. related that she did not feel like he was trying to educate her about sex, said the videos were not like the videos shown during her sex-education class, and described the videos as inappropriate for her age and as having no value. She told him that she did not want to watch the videos, but he made her watch and told her that he was making her watch for educational purposes.

In addition to testifying about the videos, L.M. discussed photos that Vaughn showed her and that she did not want to see. First, she related that when she was eleven or twelve, he showed her a photo of a naked woman. Next, L.M. testified that he showed her pictures of Mother naked and described Mother as "a goddess." L.M. did not think the photos were appropriate for viewing at her age, said there was no value to her having seen the photos, and did not believe they were shown to her for an educational purpose.

L.M. testified that she went to live with Father after she made an outcry and that Mother and Vaughn were ordered not to be around her; however, she explained that Mother disregarded the order by picking up Brother and her at school and driving them to Mother and Vaughn's house. Vaughn followed behind them in his SUV. At the house, Vaughn and Mother "badgered" them by asking questions before the police ultimately arrived. One of the responding officers testified that L.M. and Brother related that Mother and Vaughn were attempting to film the children denying the allegations.

During her cross-examination, L.M. denied making up the allegations against Vaughn and denied enjoying claiming to be a victim of sexual abuse. When later called as a witness by Vaughn, L.M. testified that she had not made false accusations, that she did not make

6

an accusation about Father, that she had not gotten into trouble for lying, and that Mother was not a truth teller.

Brother testified that Vaughn tried to talk to him about sex but did not really pursue the topic. Further, Brother related that Vaughn did not expose himself to Brother or encourage Brother to masturbate. Brother stated that Vaughn did not buy him sex toys, show him pornography, request a hug while naked, or massage him. In contrast, Brother recalled that Vaughn talked with L.M. about sex, hugged her while naked, and massaged her in weird ways in areas that were not appropriate. Further, Brother testified that witnessing the massages made him uncomfortable and described the touching as sexually predatory. When discussing L.M., he said that she was an honest person, had not lied about their family, and had a good relationship with Father. On the other hand, Brother said that Mother was "a liar and a cheat."

In her testimony, Mother testified that L.M. "[h]ardly ever" told the truth. Mother described L.M. as a "compulsive" liar and believed L.M.'s lying had gotten worse over time. Further, Mother agreed that L.M. had been rewarded for lying in the past and that this had incentivized L.M. to lie more. Mother testified that L.M. previously made an outcry of improper touching against Father and said L.M. was lying if she denied making an allegation against Father. Mother denied interrogating L.M. and Brother about the allegations against Vaughn and said the children lied about that claim. Additionally, Mother admitted to still being in a relationship with Vaughn. Mother also testified that she was aware that Vaughn admitted to showing L.M. pornography and agreed that L.M. was not lying when she said Vaughn had shown her pornography. However, Mother explained that she had seen the recordings shown to L.M., did not object to them "being given to [her] daughter," and did not consider the recordings

7

to be pornographic. Further, Mother related that Vaughn's idea of providing sexual education to L.M. was "a well-placed idea."

After considering the evidence presented at trial, the jury found Vaughn guilty of the charged offense. Vaughn appeals his conviction.

## PROCEDURAL AND STATUTORY FRAMEWORK

As originally charged, the information alleged that Vaughn "did then and there intentionally and knowingly display harmful material, namely pornography, by video, and the defendant knew that the material was harmful, and the defendant was reckless about whether a minor was present who would be offended or alarmed by the display in that he presented the pornographic images for the minor child's view." The Penal Code does not include a mens rea element concerning the display of the harmful material and instead provides that a person commits an offense if he displays material that he knows "is harmful" and "is reckless about whether a minor is present who will be offended or alarmed by the display." Tex. Penal Code § 43.24(b)(2). At the time that the offense allegedly occurred, the Penal Code also included a provision establishing that "[i]t is an affirmative defense to prosecution under this section that the . . . exhibition was by a person having . . . [an] educational . . . justification." Act of May 17, 2011, 82d Leg., R.S., ch. 497, § 1, sec. 43.24, 2011 Tex. Gen. Laws 1251, 1251 (amended 2025).[2] At the start of voir dire, the State moved to modify the information and asked that the phrase "intentionally and knowingly" be deleted. Vaughn objected and argued that the State should "be required to try the case as they pled it when they filed it." The trial court allowed the State to make the requested deletion.

---

[2] The statute was amended in 2025 to remove this affirmative defense. *See* Act of May 2, 2025, 89th Leg., R.S., ch. 39, §§ 1, 3, sec. 43.24, 2025 Tex. Gen. Laws __, __.

Amendments to charging instruments are governed by article 28.10 of the Code of Criminal Procedure, which provides as follows:

(a) After notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences. On the request of the defendant, the court shall allow the defendant not less than 10 days, or a shorter period if requested by the defendant, to respond to the amended indictment or information.

(b) A matter of form or substance in an indictment or information may also be amended after the trial on the merits commences if the defendant does not object.

(c) An indictment or information may not be amended over the defendant's objection as to form or substance if the amended indictment or information charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced.

Tex. Code Crim. Proc. art. 28.10.

## DISCUSSION

In his issue on appeal, Vaughn contends that the trial court improperly allowed the State to amend the information on the first day of trial. More specifically, Vaughn argues that the trial court reversibly erred by allowing the information to be altered because "amending an information on the day of trial is automatically reversible" error and because "the trial court prejudiced [his] substantial rights." Vaughn contends that the amendment was impermissible because it affected the substance of the information or was descriptive of what was legally essential to the validity of the information. Vaughn believes that the change shifted "the burden to [him] to prove the affirmative defense of displaying harmful material for educational purposes" and away from the State, which he asserts under the original information had "to prove beyond a reasonable doubt that [he] did not intentionally or knowingly display harmful material for educational purposes." Although Vaughn acknowledges that the Penal Code does

9

not require that the display be intentional or knowing, he asserts that by alleging this "additional" mens rea, the State was obligated to prove it at trial. When presenting his arguments, he points to evidence that he urges supports his claim that he showed the videos for educational purposes and then asserts that he would have argued at trial if the deletion had not occurred that this evidence showed that the State had not proved beyond a reasonable doubt that he was intentionally or knowingly displaying harmful material.

Vaughn's issue is predicated on the law pertaining to alterations to charging instruments. That area of law has undergone significant changes over the last few decades, and some more recent appellate decisions have left uncertainty regarding whether some decades-old law still applies in this area. To properly address Vaughn's issue and identify the uncertainty, we provide a summary of the evolution of the law and some significant changes that have occurred.

Decades ago, the Court of Criminal Appeals addressed an issue concerning an amendment being made to an indictment after trial had started. *See Burrell v. State*, 526 S.W.2d 799 (Tex. Crim. App. 1975). In that case, after a jury had been selected, the State moved to alter the indictment to remove, among other words, the phrase "and with his malice aforethought." *Id.* at 800. The Court noted that "malice aforethought" was not an element of the charged offense of "assault to murder a peace officer." *Id.* at 801. Further, the Court explained that typically "unnecessary words or allegations may be rejected as surplusage" and disregarded. *Id.* at 802. However, the Court stated that "[t]here is . . . a well recognized exception to the general rule discussed above, and that is where the unnecessary matter is descriptive of that which is legally essential to charge a crime," in which case that matter "must be proven as alleged, even though needlessly stated." *Id.* Next, the Court reasoned that although "malice aforethought" was not an essential allegation, it was "descriptive and explanatory of the assault and intent." *Id.* at 804.

10

Accordingly, the Court concluded that the deletion "from the indictment was an amendment of substance, for which reason the conviction . . . must be reversed." *Id.*

Later, in *Sodipo v. State*, 815 S.W.2d 551 (Tex. Crim. App. 1990), the Court of Criminal Appeals addressed the propriety of another alteration made to an indictment. In that case, the State moved to modify the indictment before jury selection by changing the cause number alleged in an enhancement paragraph. *Id.* at 552. The defendant objected. *Id.* The trial court determined that the alteration did not change the substance of the indictment and overruled the objection. *See id.* at 553. On appeal, the Court of Criminal Appeals referenced article 28.10 of the Code of Criminal Procedure and explained that neither subarticle 28.10(a) nor subarticle 28.10(b) "addresses an indictment amendment on the date of trial prior to the commencement of trial on the merits" because subarticle 28.10(a) addressed amendments occurring before the date a trial on the merits commences and because subarticle 28.10(b) applies to amendments made after a trial on the merits has commenced. *Id.* at 555 (op. on reh'g). In other words, the Court determined that article 28.10 authorizes amendments at two time periods only and that any amendment falling outside one of those time periods is improper. *Id.* at 556 n.4. For that reason, the Court determined that the trial court erred by granting the State's request to amend the indictment before the jury had been selected and before trial on the merits had commenced. *Id.* at 556. Accordingly, the Court reversed the judgment of the court of appeals and remanded the case to the trial court. *Id.*; *see Garza v. State*, 50 S.W.3d 559, 563 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("[N]o amendment is allowed on the day of trial before trial begins.").

The Court of Criminal Appeals later clarified this area of law and distinguished an amendment from an abandonment. *See Eastep v. State*, 941 S.W.2d 130, 132-33 (Tex. Crim. App. 1997). "An amendment is an alteration to the face of the charging instrument which affects

11

the substance of the charging instrument," including changes such as altering the alleged weapon, adding the manner and means of committing an offense, changing the day of the offense date, adding a complainant, and switching the word "possession" for "delivery." *Id.* In those situations, changes to the charging instruments must comply with the directives of article 28.10. *Id.* at 133.

"Conversely, an abandonment, even though accomplished by an actual physical alteration to the face of the charging instrument, does not affect its substance." *Id.* The Court explained that the following constitute abandonments: "(1) abandonment of one or more of the alternative means in which an offense may be committed," "(2) abandonment of an allegation in the charging instrument if the effect of such abandonment is to reduce the prosecution to a lesser included offense," and "(3) abandonment of surplusage." *Id.* at 135. Changes falling within one of these three categories listed above are abandonments and "do not invoke the requirements of article[] 28.10." *Id.*

Concerning the third type, the Court stated that "[s]urplusage is unnecessary language not legally essential to constitute the offense alleged in the charging instrument" and that the charging instrument may be altered to delete surplusage. *Id.* at 134. However, unnecessary language is not surplusage where the State has described "that which is legally essential to charge a crime" such as describing "a necessary person, place, or thing with unnecessary particularity." *See id.* at 134 n.7. The Court of Criminal Appeals has referred to this exception to the "general surplusage rule" as the *Burrell* exception because of its affiliation with that case. *See Gollihar v. State*, 46 S.W.3d 243, 250 (Tex. Crim. App. 2001).

In *Gollihar*, the Court of Criminal Appeals was later called upon to ascertain the relationship between "the law relating to surplusage," "variance law," and "legal sufficiency

12

of the evidence and how it is raised" when addressing the proper way to analyze the sufficiency of the evidence in cases where there is a disparity between the allegations in the charging instrument and what the evidence establishes at trial. *See id.* at 244, 245. The Court ultimately determined that for purposes of performing a sufficiency review, "a hypothetically correct charge need not incorporate allegations that give rise to immaterial variances." *Id.* at 256. When doing so, the Court also "reaffirm[ed] the fatal variance doctrine and overrule[d] surplusage law and the *Burrell* exception." *Id.* The Court explained that "[a]llegations giving rise to immaterial variances may be disregarded in the hypothetically correct charge, but allegations giving rise to material variances must be included." *Id.* at 257. The Court announced its intent to adopt the materiality test applied by other courts, which provides as follows:

> A variance between the wording of an indictment and the evidence presented at trial is fatal only if "it is material and prejudices [the defendant's] substantial rights." When reviewing such a variance, we must determine whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under the deficiently drafted indictment would subject the defendant to the risk of being prosecuted later for the same crime.

*Id.* (quoting *United States v. Sprick*, 233 F.3d 845, 853 (5th Cir. 2000)).

Although the Court in *Gollihar* overruled the *Burrell* exception, it did so expressly in the context of applying that law in sufficiency reviews when there is a variance between the allegations in the indictment and the evidence presented at trial. Following that ruling, intermediate appellate courts have differed concerning what, if any, implicit effect the ruling in *Gollihar* had in the context of changes to charging instruments under article 28.10 and have followed three different paths when attempting to assess the effect.

13

**Materiality**

Under the first approach, reviewing courts have determined that the *Burrell* exception did not survive the *Gollihar* ruling in the context of changes to charging instruments and that the surplusage concept has been replaced with a materiality test as had been done in *Gollihar*. *See Briscoe v. State*, 542 S.W.3d 109, 113 (Tex. App.—Texarkana 2018, pet. ref'd); *Balentine v. State*, 474 S.W.3d 682, 686 (Tex. App.—Beaumont 2013, pet. ref'd). When explaining its reasoning, one of our sister courts discussed the directives of article 28.10 pertaining to amendments to charging instruments and explained that it allows the State "to amend the indictment over the defendant's objection with two limitations: (1) the amendment must be made 'before the date the trial on the merits commences' and (2) amendment cannot occur if the amendment would 'charge[] the defendant with an additional or different offense or if the substantial rights of the defendant [would be] prejudiced.'" *Briscoe*, 542 S.W.3d at 115 (quoting Tex. Code Crim. Proc. art. 28.10).

Our sister court noted that the "substantial rights" language in subarticle 28.10(c) is similar to the language the Court of Criminal Appeals used in *Gollihar* when it explained in the sufficiency context "that a variance that is not prejudicial to a defendant's 'substantial rights' is immaterial." *Id.* (quoting *Gollihar*, 46 S.W.3d at 248). "Based on this similarity, it follows that *Gollihar* applies to Article 28.10(c) as well." *Id.* Our sister court determined that the question in the amendment and sufficiency contexts is the same: "whether the indictment, [without the descriptive information,] informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under the . . . indictment[, without the descriptive information,] would subject the defendant to the risk of being prosecuted later for the same crime." *Id.* (quoting *Gollihar*, 46 S.W.3d at 257); *see*

14

*Balentine*, 474 S.W.3d at 686.  If the answer to both of these questions is no, then not only may the language be disregarded as immaterial in deciding sufficiency of the evidence, it may also be deleted from the indictment over the defendant's objection without violating Article 28.10(c)." *Briscoe*, 542 S.W.3d at 115.

If this approach is adopted, defendants are given some protection from potentially significant changes being made to charging instruments by addressing whether the suggested alteration is material.  However, appellate courts considering the issue may have to consider the entire record when making a materiality assessment.  *Cf. Gollihar*, 46 S.W.3d at 258 (noting that entire record, not just indictment, may be referred to in protecting against double jeopardy). An assessment of the entire record is employed in harm analyses, *see Stredic v. State*, 663 S.W.3d 646, 656 (Tex. Crim. App. 2022) (noting that harmless-error analysis considers "the record as a whole"), and is also used to assess materiality in the context of a sufficiency claim, *see Gollihar*, 46 S.W.3d at 257.  However, consideration of the entire record is generally inconsistent with the more typical directives instructing appellate courts to consider the record before the trial court at the time of a ruling to determine if the ruling was error.  *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

**Surplusage Remains Without *Burrell* Exception**

Regarding the second approach, one of our sister courts has agreed in a published opinion that "the Court of Criminal Appeals has expressly overruled the *Burrell* exception" in *Gollihar* and that the overruling applied to issues arising under article 28.10.  *Alston v. State*, 175 S.W.3d 853, 855 (Tex. App.—Waco 2005, no pet.).  However, unlike the above cases which considered whether an alteration was material when deciding if it was an abandonment, our sister

15

court in *Alston* explained that with the elimination of the *Burrell* exception, alterations that eliminate "surplusage" may be done as amendments without invoking article 28.10 and without considering if the language sought to be removed describes a necessary person, place, or thing. *Id.*; *see also Hoisager v. State*, No. 03-13-00328-CR, 2015 WL 4537581, at *2 (Tex. App.—Austin July 17, 2015, pet. ref'd) (mem. op., not designated for publication) (explaining that without *Gollihar* exception, test for whether alteration is abandonment that does not invoke article 28.10 is whether change is surplusage, meaning that it "is not legally essential" to constitute charged offense).  In other words, surplusage law survives but without the *Burrell* exception.

Under our sister court's analysis, provided that the term sought to be removed was not essential to constitute the offense for which a defendant had been charged, "then the striking of th[e] term was a permissible abandonment."  *Alston*, 175 S.W.3d at 855.  Further, our sister court explained that a term is not essential to constitute an offense if it is not an element of the offense.  *Id.*  This Court and several other courts have employed this approach in unpublished and nonbinding cases. *See Gadson v. State*, No. 08-15-00108-CR, 2017 WL 728369, at *4 (Tex. App.—El Paso Feb. 24, 2017, pet. ref'd) (op., not designated for publication); *Jefferson v. State*, No. 05-15-00477-CR, 2016 WL 3749396, at *2 (Tex. App.—Dallas July 7, 2016, pet. ref'd) (mem. op., not designated for publication); *Hoisager*, 2015 WL 4537581, at *3; *see also* Tex. R. App. P. 47.7(a) (noting that unpublished criminal cases have no precedential value).

While this approach is beneficial because the simplicity of a more bright-line rule allows appellate courts to review a trial court's decision based on the information available to the trial court at the time of the ruling, significant changes to a charging instrument could be made over an objection if the omitted language was not legally essential to constitute an offense.  If the

State chose to unnecessarily include allegations beyond the elements of an offense, it could seemingly delete that surplusage even if the defendant relied on the language when preparing a defense.

***Burrell* Exception Still Applies**

In the final approach, our sister courts have concluded that the ruling in *Gollihar* was limited to the sufficiency context and did not overrule surplusage law or the *Burrell* exception in the context of changes made to a charging instrument. *Mayfield v. State*, 117 S.W.3d 475, 476 n.1, 477 (Tex. App.—Texarkana 2003, pet. ref'd) (determining that surplusage law, including *Burrell* exception, still applied in indictment cases following *Gollihar*); *Hall v. State*, 62 S.W.3d 918, 920 (Tex. App.—Dallas 2001, pet. ref'd) (concluding that "the material variance doctrine has no place in determining whether an alteration of an indictment is an abandonment or an amendment"); *see also Gollihar*, 46 S.W.3d at 260 n.12 (Keller, J., concurring) (distinguishing between sufficiency challenges and indictment alterations); *Ramsey v. State*, No. 08-03-00457-CR, 2005 WL 375303, at *2-3 (Tex. App.— El Paso Feb. 10, 2005, no pet.) (op., not designated for publication) (noting that *Gollihar* overruled *Burrell* exception in fatal-variance context and concluding that deletion at issue was abandonment because it did not describe what was legally essential to charged offense). Although our sister courts indicated their belief that *Gollihar* did not extend to issues pertaining to charging instruments, one of those courts reasoned that "a logical extension of *Gollihar* to indictment cases could allow any language in an indictment to be deleted as an abandonment if the deletion would not result in a material variance." *Hall*, 62 S.W.3d at 920 n.1. However, that

17

court explained that it would continue to apply surplusage law to "indictment cases" until the Court of Criminal Appeals made an express ruling on the issue. *Id.*[3]

Under this approach, in which surplusage law and the *Burrell* exception remain good law for changes to charging instruments, there would be an incongruence in how charging instruments are viewed in sufficiency challenges and in how they are treated in issues pertaining to changes made to them. As our sister court explained:

> If the *Burrell* exception prohibited the deletion of descriptive surplusage from the indictment under Article 28.10(c), then the challenged language would remain in the indictment during trial. Yet, if the descriptive information is immaterial under the test announced in *Gollihar*, then after conviction, the appellate court could simply disregard the descriptive information in determining whether the evidence was insufficient to sustain the conviction.

*Briscoe*, 542 S.W.3d at 115.

As shown above, there is some confusion in the courts of appeals regarding what effect, if any, the decision in *Gollihar* had on how to address issues concerning changes made to charging instruments. Considering the ambiguity in *Gollihar* regarding whether the ruling reaches charging-instrument issues as well as sufficiency reviews, we can understand why the appellate courts are divided on this issue and why three different approaches have developed.[4]

---

[3] We note that another of our sister courts recognized some appellate courts' conclusion that *Gollihar* affected the applicability of the *Burrell* exception to cases like the present one, but that court explained that it did not need to determine whether the *Burrell* exception survived in this context because it would not have applied anyway. *See Fury v. State*, 607 S.W.3d 866, 873 n.2 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd).

[4] We recognize that other options are theoretically available, including the conclusion that any alteration to a charging instrument constitutes an amendment and must, therefore, comply with article 28.10. However, that option has been firmly rejected by the Court of Criminal Appeals. *See Eastep v. State*, 941 S.W.2d 130, 133 (Tex. Crim. App. 1997). The options outlined above seem to be the ones available depending on how the analysis from *Gollihar* is construed.

Given the absence of a clear answer on this issue and the significant consequences that would result from whichever approach is ultimately adopted, we urge that this is an issue that needs to be resolved by the Court of Criminal Appeals. Under the unique circumstances present in this case, we need not ultimately decide which approach to apply because the result would be the same under all three.

**Surplusage Remains Without *Burrell* Exception**

As set out above, "[s]urplusage is unnecessary language not legally essential to constitute the offense alleged in the charging instrument." *Eastep*, 941 S.W.2d at 134. Moreover, absent the *Burrell* exception, "the charging instrument may be altered to delete language which is not descriptive of what is legally essential to the validity of the indictment." *Id.* Although section 43.24 includes a knowing mental state concerning whether the defendant was aware of the harmful nature of the material and a reckless mental state about whether a minor was around when the material was displayed, the Penal Code does not specify a mens rea element for the display component of the offense. *See Celis v. State*, 416 S.W.3d 419, 423, 427 (Tex. Crim. App. 2013) (plurality op.) (concluding that "the plain language of the false-lawyer statute requires proof of a mental state" as to one element and "plainly dispenses with any additional culpable-mental-state requirement" where language only required one element be committed "with intent," reasoning that requiring defendant act intentionally as to that element "satisfied 'the traditional mens rea requirement of the criminal law,'" and explaining that "[t]his prescription of a mental state as to one element and not as to others sufficiently demonstrates the Legislature's intent to dispense with a mental state as to those other elements" (quoting *Celis v. State*, 354 S.W.3d 7, 27 (Tex. App.—Corpus Christi-Edinburg 2011), *aff'd* 416 S.W.3d 419

19

(Tex. Crim. App. 2013))); *see also State v. Taylor*, 322 S.W.3d 722, 727 (Tex. App.—Texarkana 2010, pet. ref'd) ("If any section of the statute prescribes a mental state while another section omits a mental state, such omission indicates or implies that the Legislature intended to dispense with a mental element in that section.").

Accordingly, the intentional and knowing mental states included in the information were not elements of the offense of improper display of harmful material to a minor. *See Burrell*, 526 S.W.2d at 800 (noting that improperly included malice aforethought mens rea was not element of charged offense); *see also Durrough v. State*, 620 S.W.2d 134, 138 (Tex. Crim. App. 1981) (noting that term "malice aforethought necessarily includes the idea" that action was performed with "the culpable mental state of intentionally"). Assuming that the remainder of surplusage law without the *Burrell* exception still applies to the law concerning changes to charging instruments following *Gollihar*, the trial court did not err by allowing the information to be altered because the deleted portion constituted surplusage and could be abandoned without complying with the requirements of article 28.10. *See Hoisager*, 2015 WL 4537581, at *3; *Alston*, 175 S.W.3d at 855.

**Materiality**

When one of our sister courts of appeals decided that the materiality of a change to a charging instrument should be considered when determining if a change is an amendment or an abandonment, it explained that the question to be addressed is whether the modified charging instrument would inform "the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under" the modified charging instrument "would subject the defendant to the risk of being prosecuted later for the same

20

crime." *Briscoe*, 542 S.W.3d at 115 (quoting *Gollihar*, 46 S.W.3d at 257); *see Balentine*, 474 S.W.3d at 686. If the answer to both is no, then the language may be deleted over objection without violating article 28.10. *Briscoe*, 542 S.W.3d at 115.

Although Vaughn contends that allowing the State to modify the information affected his ability to present a defense because he could no longer argue that his display of the videos was not intentional or knowing, he admitted to the police that he chose to and wanted to show "pornographic" videos to L.M. and precleared their use with Mother, effectively conceding that his actions were intentionally and knowingly undertaken. *See* Tex. Penal Code § 6.03 (defining intentional and knowing mental states); *see also Gollihar*, 46 S.W.3d at 258 (noting that defendant admitted to conduct at issue). Moreover, Vaughn elicited testimony from Mother indicating that she saw one of the videos that he showed L.M. Additionally, the information before and after it was altered informed Vaughn that he had been charged with displaying harmful material to a minor by displaying "harmful material, namely pornography, by video," while knowing that the material was harmful and being reckless about whether a minor was present who would be offended or alarmed. *See Balentine*, 474 S.W.3d at 686 (noting that when determining if indictment provided notice, that courts consider "the offense elements, which include the forbidden conduct, any required culpability, any required result, and the negation of any exception to the offense"). The information tracked the language of the statute and gave him notice of what he had been charged with. *See* Tex. Penal Code § 43.24(b)(2); *see Balentine*, 474 S.W.3d at 686 (noting that indictment tracked language of statute).

Further, the needless allegation did not prevent Vaughn from pursuing through the testimony and other evidence admitted at trial his affirmative defense that the display was for an educational purpose. *See* Act of May 17, 2011, 82d Leg., R.S., ch. 497, § 1, sec. 43.24,

21

2011 Tex. Gen. Laws 1251, 1251 (amended 2025); *Briscoe*, 542 S.W.3d at 116; *see also* Tex. Penal Code § 2.04 (explaining that "the defendant must prove [an] affirmative defense by a preponderance of evidence"). Moreover, he was able to further his defense from additional allegations beyond those that he admitted to by challenging L.M.'s credibility and truthfulness and by asserting that L.M. had made other claims of sexual abuse. In his opening statement, he urged that L.M. lied, that she invented false claims against other men, and that Mother thought L.M. was a liar. In his closing argument, he suggested that Mother approved of L.M.'s watching the videos and that Vaughn gave L.M. the video to help her because she was growing up. Nothing in the record indicates that Vaughn did not understand the charges against him, was misled by the needless allegation, or was surprised by the evidence at trial. *See Gollihar*, 46 S.W.3d at 258. Accordingly, we conclude that Vaughn was informed "of the charge against him sufficiently to allow him to prepare an adequate defense at trial." *See Briscoe*, 542 S.W.3d at 116 (quoting *Gollihar*, 46 S.W.3d at 257).

Additionally, Vaughn is not in danger of being prosecuted again for the same crime in a later proceeding. *See id.* In considering whether a defendant "is subject to being prosecuted again for the conduct covered by his indictment, a court has a right to consider the entire record and not just the indictment in protecting him against double jeopardy should the State seek to prosecute him a second time for conduct on which he was tried." *Coleman v. State*, 696 S.W.3d 148, 161 (Tex. App.—Beaumont 2023, no pet.). Although the deletions removed extra mens rea elements that the State needlessly included, the actual misconduct alleged and when it occurred remained the same. *See Balentine*, 474 S.W.3d at 688 (noting that State did not attempt to broaden scope of offense and that "the deletion did not result in [defendant's] being charged with an additional or different offense"). Moreover, the evidence presented at trial

22

concerned the conduct alleged in the information. Consequently, based on the entire record, we conclude that Vaughn's prosecution under the altered information would not subject him "to the risk of being prosecuted later for the same crime." *Briscoe*, 542 S.W.3d at 117 (quoting *Gollihar*, 46 S.W.3d at 257).

For these reasons, assuming that the materiality test applies, we conclude that the trial court did not err by allowing the State to delete the immaterial allegations. *See Briscoe*, 542 S.W.3d at 117.

### *Burrell* Exception Still Applies

As set out above, the *Burrell* exception explained that items included in a charging instrument that are not elements of the charged offense may not be deleted as surplusage when they are "descriptive of what is legally essential to the validity of" the charging instrument. 526 S.W.2d at 802; *see Eastep*, 941 S.W.2d at 134 n.7. Moreover, the Court of Criminal Appeals has determined that the inclusion of unnecessary culpable mental states, even though not essential allegations, were descriptive and explanatory of what was legally essential and, therefore, could not be excluded as surplusage. *See Burrell*, 526 S.W.2d at 803 (concerning deletion of phrase "malice aforethought"); *McDonald v. State*, 137 S.W.2d 1046, 1047 (Tex. Crim. App. 1940) (addressing removal of word "gross" before word "negligence"). Like those cases, inclusion of the phrase "intentionally and knowingly," though unnecessary, was descriptive of the display element, which was essential to the validity of the information. *See* Tex. Penal Code § 43.24. Accordingly, under *Burrell*, the phrase could not be removed as mere surplusage over Vaughn's objection because the change constituted an amendment. *See* 526 S.W.2d at 802. For that reason, assuming *Burrell* still applies, the requirements of article

28.10 needed to have been complied with. *See* Tex. Code Crim. Proc. art. 28.10. As pointed out by Vaughn, the Court of Criminal Appeals has explained that it is error under article 28.10 to make an amendment over a defendant's objection on the day of trial before a jury is selected and before the commencement of the trial on the merits as happened in this case. *See Sodipo*, 815 S.W.2d at 556.

Even assuming that the analysis from *Sodipo* compels a conclusion that the amendment was erroneous and did not comply with article 28.10, that would not end the analysis. As pointed out by Vaughn, the Court of Criminal Appeals determined in *Sodipo* and *Eastep* that violations of article 28.10 were not subject to a harm analysis. 941 S.W.2d at 135; 815 S.W.2d at 556; *see also Brown v. State*, 828 S.W.2d 762, 764 (Tex. Crim. App. 1991) (concluding that "no breach of Article 28.10 should be tolerated in the trial court, regardless of its probable effect on the outcome of trial, and . . . no speculation about the impact of such an error under [the rule of appellate procedure governing harm analyses] should be attempted on appeal"). However, those cases were decided before the Court issued an opinion that fundamentally changed how appellate courts evaluate harm in criminal appeals. *See Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997), *superseded in part on other grounds by* Tex. R. App. P. 44.2. Although not specifically addressing errors under article 28.10, the Court addressed all types of error and explained as follows:

> Except for certain federal constitutional errors labeled by the United States Supreme Court as "structural," no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis. Of course, where the error involved defies analysis by harmless error standards or the data is insufficient to conduct a meaningful harmless error analysis, then the error will not be proven harmless [under the rule of appellate procedure governing harm analyses]. . . . [A]ppellate courts should not automatically foreclose the application of the harmless error test

24

to certain categories of error.

*Id.* at 264. In another case, the Court reaffirmed its holding by explaining "that only errors labeled as structural by the Supreme Court are immune from a harm analysis." *Mercier v. State*, 322 S.W.3d 258, 263 (Tex. Crim. App. 2010).

Moreover, when later addressing an issue concerning whether a defendant should have been given ten days to address an amendment under subarticle 28.10(a), the Court cited its decision in *Cain* and addressed whether the alleged error harmed the defendant. *See Wright v. State*, 28 S.W.3d 526, 531-32 (Tex. Crim. App. 2000), *superseded by statute on other grounds as recognized by Coleman v. State*, No. AP–75478, 2009 WL 4696064, at *11 & n.46 (Tex. Crim. App. Dec. 9, 2009) (op., not designated for publication). Although the Court did not in that case address all potential errors under article 28.10, our sister court of appeals has determined that, under *Cain*, other errors under article 28.10 are "not categorically immune to a harmless-error analysis" and applied a nonconstitutional-error harm analysis to the alleged error. *Marks v. State*, 525 S.W.3d 403, 415 (Tex. App.—Houston [14th Dist.] 2017), *aff'd on other grounds by* 560 S.W.3d 169 (Tex. Crim. App. 2018). We agree with our sister court that a violation of article 28.10 is subject to a nonconstitutional-error harm analysis. *Cf. Mason v. State*, 322 S.W.3d 251, 255 (Tex. Crim. App. 2010) (noting that statutory violation was "not constitutional error").

Nonconstitutional errors must be disregarded unless they affect substantial rights. Tex. R. App. P. 44.2(b). A defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In determining whether a defendant's substantial

rights were affected, the reviewing "court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). "The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments and even voir dire, if applicable," and the court may also consider "whether the State emphasized the error." *Motilla*, 78 S.W.3d at 355-56. If the reviewing court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect," then the defendant's substantial rights were not affected. *Id.* at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

The evidence in this case supports the jury's verdict. *Cf. id.* at 358 (noting that "evidence of the defendant's guilt is a factor to be considered" in harm analysis under Rule 44.2(b)). L.M. testified regarding multiple incidents in which Vaughn showed her pornographic videos of one or more individuals engaging in sex acts and in which he showed her photos of naked women, including Mother. The record also includes a recording of Vaughn's interview with the police in which he admitted that he gave L.M. two "pornographic" videos to watch. He also effectively conceded to intentionally and knowingly performing these acts through his admissions, which significantly undermined any potential harm from the allegedly improper deletion. Mother corroborated L.M.'s testimony on this matter by stating that she had seen one of the videos and by stating that L.M. did not lie about Vaughn showing her pornographic videos. Additionally, a recording of Vaughn's arrest and the testimony from one of the officers

26

involved in the arrest showed that Vaughn was attempting to hide from the police. *Cf. Williams v. State*, 440 S.W.3d 717, 720 (Tex. App.—Amarillo 2013, pet. ref'd) ("Effort to escape evinces a consciousness of guilt, which in turn is evidence of culpability.").

Although Vaughn admitted on the recording to giving L.M. the videos to watch, he claimed that he was doing so for educational purposes, which was an affirmative defense at the time of the alleged offense. *See* Act of May 17, 2011, 82d Leg., R.S., ch. 497, § 1, sec. 43.24, 2011 Tex. Gen. Laws 1251, 1251 (amended 2025). Mother also testified that Vaughn's attempts to provide sexual education to L.M. in this manner was a good idea. However, evidence was presented during the trial that would have allowed the jury to conclude that the defense had not been proven and that Vaughn had a motive other than education for showing the material. For example, L.M. testified regarding other sexual conduct that Vaughn engaged in around her, including being naked around her, touching her while he was naked, touching the inside of her thigh when discussing sexual assault, asking her to massage him near his genitals, buying her a vibrator, offering to insert a tampon for her, asking her to model bras, and inquiring if she masturbated. Further, Brother testified that Vaughn did not engage in the same behaviors or discussions with him and that Vaughn would touch L.M. in ways that seemed predatory and made Brother uncomfortable.

Even though Vaughn was able to attack L.M.'s credibility through Mother's testimony asserting that L.M. was a liar and had made a claim against Father, L.M. and Brother directly contradicted those claims concerning L.M. and also testified that Mother lies. When assessing Mother's credibility, the jury could also consider that Mother admitted to still being in a relationship with Vaughn. In addition, L.M. testified that Mother violated a court order by picking up Brother and her from school after she made the allegations, that Vaughn followed

27

them in his car, and that Vaughn and Mother questioned them about the allegations. A police officer drove to the home after the children were picked up from school, and the officer testified that L.M. and Brother both told him that Mother and Vaughn were attempting to film the children retracting their allegations.

Moreover, as set out above, Vaughn was able to present through his opening statement and closing argument his defense that he showed L.M. materials to help educate her about sex, his challenge to L.M.'s credibility, and his claim that L.M. had made false claims against other men.

In light of the preceding, we must conclude that any error resulting from the trial court's allowing the State to alter the information did not have "a substantial and injurious effect or influence in determining the jury's verdict" and therefore did not affect Vaughn's substantial rights. *See King*, 953 S.W.2d at 271. Accordingly, we hold that any error would be harmless. *See* Tex. R. App. P. 44.2(b).

For these reasons, we conclude that regardless of which of the three legal landscapes applies to the issue in this case, we would be unable to sustain his issue on appeal under the facts of this case. Therefore, we overrule Vaughn's issue on appeal.

## CONCLUSION

Having overruled Vaughn's issue on appeal, we affirm the trial court's judgment of conviction.

_____

Karin Crump, Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Affirmed

Filed:   December 4, 2025

Publish

29